**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| GEORGE D. MANDERBACH, INC. d/b/a MANDERBACH FORD, DLR AUTO GROUP LLC, SMITH COLLISION CENTER, and BROADWAY PRECISION COLLISION, on Behalf of All Others Similarly Situated, | Civil Action No: |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| CDK GLOBAL, LLC | |
| Defendant. | |

Plaintiffs George D. Manderbach, Inc., d/b/a Manderbach Ford ("Manderbach Ford"), DLR Auto Group LLC ("DLR Auto Group"), Smith Collision Center, and Broadway Precision Collision ("Plaintiffs"), individually and on behalf of the Class defined below, bring this action against Defendant CDK Global LLC ("CDK Global") and allege as follows:

## INTRODUCTION

1.      This action arises out of Defendant CDK Global's failure to maintain adequate data security measures, which led to the foreseeable event of a data breach followed by the foreseeable injuries inflicted on the many automotive businesses that rely on CDK Global's dealer management system.

2.      CDK is a "software-as-a-service" provider used by more than 15,000 auto dealers, repair shops, and other automotive businesses nationwide. Automotive businesses use CDK's software to operate and manage critical components of their operations, including sales, financing,

payroll, service, and customer relations. Automotive businesses pay CDK Global significant subscription fees to use its proprietary dealer management software.

3.     On June 18 and June 19, 2022, CDK suffered two cybersecurity incidents (the "Data Breaches"). For more than two weeks after the Data Breaches, automotive businesses like Plaintiffs, who use Defendant's services, were unable to process sales and suffered delays in processing service requests and ordering parts, causing hundreds of millions of dollars in monetary losses and irreparable reputational harm.

4.     Plaintiffs and Class members now must contend with the continuing fallout from the Data Breaches. Plaintiffs therefore bring this action for damages, loss of the benefit of the bargain, and restitution on their own behalf and for all others similarly situated.

## PARTIES

5.     Plaintiff Manderbach Ford is an independent Ford dealership located in Hamburg, Pennsylvania.

6.     Plaintiff DLR Auto Group LLC is an automobile broker located in Agoura Hills, California.

7.     Plaintiff Smith Collision Center is an automobile repair shop located in Ada, Oklahoma.

8.     Plaintiff Broadway Precision Collision is an automobile repair shop located in Ada, Oklahoma.

9.     Defendant CDK Global is a limited liability company organized under the laws of Delaware, with its headquarters and principal place of business located Hoffman Estates, Illinois.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over the lawsuit under the Class Action Fairness Act, 28 U.S.C. § 1332, because this is a proposed class action in which: (1) there are at least 100 class members; (2) the combined claims of class members exceed $5,000,000, exclusive of interest, attorneys' fees, and costs; and (3) CDK Global and one or more class members are citizens of different states.

11. The Court has personal jurisdiction over CDK Global because its principal place of business is within this District, and it has sufficient minimum contacts in Illinois to render the exercise of jurisdiction by this Court proper and necessary.

12. For the same reasons, venue is properly laid in this forum under 28 U.S.C. § 1391(b).

## FACTUAL ALLEGATIONS

### A. Background Regarding CDK Global

13. As noted above, CDK Global is a "software-as-a-service" provider that hosts a suite of applications used by more than 15,000 car dealerships, automotive repair shops, and other automotive businesses nationwide. By some estimates, CDK Global controls almost 50% of the market for auto dealership software in the United States.[1] CDK Global highlights that it is the "North American leader in providing mission-critical enterprise resource planning solutions and software for automotive dealerships."[2]

---

[1] Belle Lin, *CDK Global Hack Shows Risk of One Software Vendor Dominating an Industry*, WALL ST. J. (June 29, 2024), https://www.wsj.com/articles/cdk-global-hack-shows-risk-of-one-software-vendor-dominating-an-industry-5156420d.

[2] *Brookfield to Acquire CDK Global Inc.*, BROOKFIELD ASSET MGMT. (Apr. 7, 2022), https://bbu.brookfield.com/press-releases/bbu/brookfield-acquire-cdk-global-inc.

14. Car dealerships use CDK Global's software to operate and manage critical components of their operations, including sales, financing, payroll, service, and customer relations.

15. For example, CDK Global offers car dealerships access to its Dealer Management System ("DMS"), a "suite of powerful software tools that equips auto dealers with the solutions they need to be profitable on one fully integrated platform."[3]

16. Many car dealerships rely on CDK Global's software, including its DMS, for their entire sales process, including to generate necessary paperwork, store sales contracts, manage vehicle inventory, secure financing, and register new vehicles.

17. Car dealerships, automotive repair shops, and other automotive businesses also rely on CDK Global's software to schedule customer appointments, track and obtain parts, manage service requests, process payroll, and perform other critical tasks.

**B.     The Data Breach**

18. On June 18, 2024, CDK Global suffered a cyberattack, resulting in CDK shutting down its data centers and IT systems.

19. On June 19, 2024, CDK Global made the following statement:

> We are actively investigating a cyber incident. Out of an abundance of caution and concern for our customers, we have shut down most of our systems and are working diligently to get everything up and running as quickly as possible.[4]

---

[3] CDK Global, *Dealer Management System*, https://www.cdkglobal.com/dms (last visited July 9, 2024).

[4] Lawrence Abrams, *CDK Global Cyberattack Impacts Thousands of US Car Dealerships*, BLEEPINGCOMPUTER (June 19, 2024), https://www.bleepingcomputer.com/news/security/cdk-global-cyberattack-impacts-thousands-of-us-car-dealerships/.

20.     That same day, while attempting to restore the services affected by the first Data Breach, CDK Global suffered a second cyberattack, causing it to again shut down most of its systems.

21.     On June 20, 2024, CDK Global released the following statement to dealerships:

> If you are not aware, we experienced an additional cyber incident late in the evening on June 19.
>
> We continue to act out of caution, and to protect our customers, we have taken down most of our systems. Do not attempt to access the DMS until we can confirm the system is secure. Digital Retail and CDK phones continue to be functional.
>
> At this time, we do not have an estimated time frame for resolution and therefore our dealers' systems will not be available likely for several days.
>
> As of now, our Customer Care channels for support remain unavailable as a precautionary measure to maintain security. It is a high priority to reinstate these services as soon as possible.
>
> Along with the Critical Situation emails, we are providing updates in Unify and have two phone numbers to contact CDK for the latest recorded update.[5]

22.     CDK Global subsequently warned customers that threat actors posing as CDK employees or affiliates were calling customers and trying to obtain access to their systems.

23.     The Data Breaches have had debilitating effects on car dealerships, automotive repair shops, and other automotive business who use CDK Global's systems throughout the United States, such as Plaintiffs, which have been unable to timely process hundreds of millions of dollars in sales and services. The Data Breaches forced Defendant to shut down its servers and services,

---

[5] Lawrence Abrams, *CDK Global Hacked Again While Recovering From First Cyberattack*, BLEEPINGCOMPUTER (June 20, 2024), https://www.bleepingcomputer.com/news/security/cdk-global-hacked-again-while-recovering-from-first-cyberattack/.

depriving Plaintiffs and Class members access to critical software and information necessary to run their businesses.

24.    Deprived of access to CDK Global's services, many dealerships and repair shops effectively shut down, while some resorted to manually processing paperwork and transactions in order to continue selling and servicing vehicles—a time-consuming process that doubled or tripled wait times.

25.    The Data Breaches and associated delays significantly reduced new vehicle sales and resulted in substantial financial losses for dealerships and repair shops. According to one estimate by J.D. Power, the Data Breaches were expected to reduce new vehicle sales in June by about 100,000 vehicles, or more than 7%, compared with the same period in 2023.[6]

26.    An analysis by the Anderson Economic Group further estimated that "dealer losses could reach $944 million," though that figure assumes that purchasers whose sale contracts were interrupted by the Data Breaches would complete their intended purchase.[7]

**C.    CDK Global Had a Duty to Maintain Adequate Cybersecurity Systems and Protocols**

27.    CDK Global knew that it maintained sensitive data on its systems, and that it faced a heightened risk of cyberattack due to the nature of that data.

28.    Indeed, CDK Global stresses the importance of data security and the potential consequences of data breaches on its website. CDK Global emphasizes that dealers should "guard against connection and security failure" and notes that "customers are trusting you with their

---

[6] Megan Cerullo, *CDK Global's Car Dealer Software Still Not Fully Restored Nearly 2 Weeks After Cyberattack*, CBS News (July 1, 2024), https://www.cbsnews.com/news/cdk-cyber-attack-update-some-systems-restored/.

[7] *Dealer Losses Due to CDK Cyberattack to Reach $944 Million in First Three Weeks*, Anderson Econ. Grp. (July 1, 2024), https://www.andersoneconomicgroup.com/dealer-losses-due-to-cdk-cyberattack-to-reach-944-million-in-first-three-weeks/.

personal data."[8] CDK Global further explains that data breaches or connectivity failures "can stop every part of your dealership in its tracks" and can result in an irreparable loss of customer trust.[9]

29.     CDK Global also promotes its "Cybersecurity Solutions," which utilize a "three-tiered cybersecurity strategy to prevent, protect and respond to cyberattacks."[10]

30.     In 2023, CDK Global released a report entitled "The State of Dealership Cybersecurity: 2023."[11] The report notes that "Defending Against Cyberthreats Is More Important Than Ever" and explains that "[c]ybercriminals continue to target dealerships with ever-evolving methods to steal user and client data, from simply stealing passwords to sophisticated phishing schemes."[12] The report further states that "Dealership Cyberattacks Increased in 2023," with 17% of dealerships reporting a recent cyberattack, and emphasizes that all dealerships are likely targets for cyberattacks.[13]

31.     CDK Global has also stressed the importance of data security in other materials. In an October 2022 post on its website, CDK Global warned that "[d]ealerships have a treasure trove of personal and financial data that could be exposed in a cyberattack" and that failure to protect this data could result in substantial financial losses as well as a loss of consumer confidence.[14]

---

[8] CDK Global, *Infrastructure*, https://www.cdkglobal.com/infrastructure (last visited July 9, 2024).

[9] *Id.*

[10] CDK Global, *Dealership Cybersecurity*, https://www.cdkglobal.com/dealership-operations/cybersecurity (last visited July 9, 2024).

[11] CDK Global, The State of Dealership Cybersecurity 2023, https://cms.cdkglobal.com/Cybersecurity2023 (last visited July 9, 2024).

[12] *Id.* at 3.

[13] *Id.* at 5, 9.

[14] CDK Global Staff, "Data Privacy: What You Should Know," CDK GLOBAL (Sept. 16, 2022), https://www.cdkglobal.com/insights/data-privacy-what-you-should-know.

32.     Federal and state government bodies have established security standards and issued recommendations to reduce the risk of cyberattack and the resulting harm to consumers and institutions. The Federal Trade Commissions has issued numerous guidelines for businesses highlighting the importance of robust and effective data and cyber security practices. The FTC has advised that it is imperative that companies factor data and cyber security into all business decision-making.

33.     In 2016, the FTC updated its publication, "Protecting Personal Information: A Guide for Business," which established guidelines for fundamental data and cyber security principles and practices for business. The guidelines note businesses should protect the personal customer and consumer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on networks; understand their network's vulnerabilities; and implement policies to correct security problems. The guidelines further recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

34.     The FTC also advises that companies limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

35.     The FTC has brought enforcement actions against businesses for failing to adequately protect confidential consumer data, treating the failure to employ appropriate measures

to prevent unauthorized access to such data as an unfair practice that violates Section 5 of the FTC Act, 15 U.S.C. § 45(a).

**D.      Plaintiff-Specific Allegations**

**<u>Manderbach Ford</u>**

36.      Plaintiff Manderbach Ford is an independent Ford dealership located at 301 Front Street in Hamburg, Pennsylvania. It operates under an umbrella of dealerships owned by the Kinley Automotive Group.

37.      Manderbach Ford contracted with CDK for CDK to provide a variety of dealer management services, including those related to accounts receivable, accounts payable and the issuance of checks. CDK also licenses software to Manderbach Ford to utilize in its day-to-day operations related to vehicle sales and warranty repairs, as well providing a mechanism through which it can obtain consumer credit reports for prospective vehicle buyers. In short, the dealer management services provided by CDK (and paid for by Manderbach Ford) are critical to Manderbach Ford's daily business operations.

38.      Beginning on or around June 18, 2024, Manderbach Ford's access to the entire CDK system was disrupted as a result of the Data Breaches. It was not until approximately three weeks later that the CDK dealer management system was restored—and even then it was not fully operational. For example, even after the system was allegedly restored, an accounting firm that Manderbach Ford had retained to conduct an audit remotely was unable to access the financial information it needed on CDK's network.

39.      The CDK outage could hardly have occurred at a worse time for Manderbach Ford. The early summer weeks leading up to the July 4th holiday are often among the highest grossing

times for auto dealers.[15] But, rather than processing vehicle sales and carrying on with business as usual, the CDK outage created chaos for the management and staff at Manderbach Ford. Manderbach Ford was unable to cut checks through the CDK system, and had to resort to using pen and paper to process sales. It was also unable to access certain rebates and incentives being offered, which further cut into potential sales. Scheduling for vehicle service was also disrupted.

40.    As a result of the Data Breaches, Manderbach Ford suffered significant economic damages, including lost earnings from new vehicle sales, lost earnings from vehicle maintenance and repair services, lost earnings from vehicle parts sales, as well as additional administrative expenses and other expenses incurred in attempting to mitigate the effects of the Data Breaches. Manderbach Ford was further injured in that it did not receive the benefit of the bargain with respect to its agreement with CDK.

### DLR Auto Group

41.    Plaintiff DLR Auto Group is an automobile broker located at 28310 Roadside Drive #250 in Agoura Hills, California.

42.    DLR Auto Group works with automobile dealerships to facilitate the sale of vehicles to customers. DLR Auto Group acts as an intermediary between the car buyer and the dealership. DLR Auto Group locates vehicles and negotiates sales contracts with dealerships on behalf of buyers, and receives commissions from the dealerships for arranging sales. DLR Auto Group's business operations relies extensively on CDK, as DLR Auto Group obtains vehicles from and finalizes sales with dealers who use CDK's dealer management software to manage vehicle inventory and process sales contracts.

---

[15] Megan Cerullo, *CDK Cyberattack Outage Could Lead to 100,000 Fewer Cars Sold in June, Experts Say*, CBS NEWS (June 28, 2024), https://www.cbsnews.com/news/cdk-attack-update-outage-car-sales-impact/.

43. Beginning on or around June 18, 2024, DLR Auto Group's business effectively shut down, as it could not obtain vehicles or finalize sales contracts with dealerships who use CDK's systems. For almost three weeks, DLR Auto Group was virtually unable to run its business.

44. As a result of the Data Breaches, DLR Auto Group suffered economic damages, including lost earnings from vehicle sales.

### Smith Collision Center

45. Plaintiff Smith Collision Center is an automobile repair shop located at 314 West 12th Street in Ada, Oklahoma.

46. Smith Collision Center relies on CDK software to order and obtain parts necessary to complete scheduled vehicle repairs. Smith Collision Center purchases auto parts from dealerships, who use CDK software to manage part inventory and process part orders. During the CDK outage, Smith Collision Center was unable to order and obtain the parts necessary to complete scheduled vehicle repairs.

47. As a result of the Data Breaches, Smith Collision Center has suffered damages associated with the interruption of its business operations, including loss of fixed operating costs and losses related to its inability to fulfill service requests.

### Broadway Precision Collision

48. Plaintiff Broadway Precision Collision is an automobile repair shop located at 11206 State Highway 99N in Ada, Oklahoma.

49. Broadway Precision Collision relies on dealerships who use CDK software to price, order, and obtain parts required to complete scheduled vehicle repairs. Broadway Precision Collision purchases auto parts from dealerships, who use CDK software to manage part inventory and process part orders. During the CDK outage, Broadway Precision Collision was unable to order and obtain the parts necessary to complete scheduled vehicle repairs.

50.     As a result of the Data Breaches, Broadway Precision Collision has suffered damages associated with the interruption of its business operations, including loss of fixed operating costs and losses related to its inability to fulfill service requests.

## CLASS ACTION ALLEGATIONS

51.     Plaintiffs bring this class action on behalf of themselves and all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1), 23(b)(2), 23(b)(3), and where applicable, 23(c)(4), on behalf of the following Class:

> **Class:** All automotive businesses in the United States who used or relied upon CDK Global's services and sustained interruption to their business operations as a result of the Data Breaches.

52.     Excluded from the Class are Defendant's officers, directors, and employees; any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Also excluded from the Class are members of the judiciary to whom this case is assigned, their families and members of their staff.

53.     Plaintiffs reserve their right to modify the Class definition, including based on discovery and further investigation.

54.     The Class is so large as to make joinder impracticable. There are at least tens of thousands of Class members. Disposition of their claims in a single action will provide substantial benefits to all parties and to the Court. Class members are readily ascertainable from information and records in Defendant's possession, custody, or control.

55.     Plaintiffs' claims are typical of the claims of the Class, as Plaintiffs, like all Class members, experienced disruption in CDK Global's services as a result of the Data Breaches.

56.     Plaintiffs are members of the Class and will fairly and adequately represent and protect its interests. Plaintiffs' counsel is competent and experienced in prosecuting class actions,

including relating to data breaches. Plaintiffs have no interest contrary to or in conflict with the interests of any other Class member.

57.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to the Class are:

- Whether CDK Global engaged in the conduct alleged;

- Whether CDK Global had a duty to implement reasonable cyber security measures to protect against cyberattack;

- Whether CDK Global breached that duty by failing to take reasonable precautions to protect against cyberattack;

- Whether CDK Global's conduct constitutes a breach of contract;

- Whether CDK Global was unjustly enriched as a result of its wrongful conduct; and

- Whether Plaintiffs and Class members are entitled to damages or restitution and in what amount.

58.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Absent a class action, most Class members would likely find the cost of litigating their claims prohibitively high and would have no effective remedy. Given the relatively small size of the individual Class members' claims, few, if any, Class members would seek redress for CDK Global's violations individually. Class treatment will conserve the resources of the courts and promote consistency and efficiency of adjudication.

59.     CDK Global acted or refused to act on grounds generally applicable to the Class, making injunctive and corresponding declarative relief appropriate with respect to the Class as a whole.

60.     Class certification also is appropriate under Rules 23(b)(1), (b)(2), and/or (c)(4) because:

- The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for CDK Global.

- The prosecution of separate actions by individual Class members would create a risk of adjudications that would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or would substantially impair or impede their ability to protect their interests.

- Defendant has acted or refused to act on grounds generally applicable to the Class, making injunctive and corresponding declaratory relief appropriate with respect to the Class as a whole; and

- The claims of Class members are comprised of common issues whose resolution in a class trial would materially advance this litigation.

## FIRST CAUSE OF ACTION
### NEGLIGENCE
**(On Behalf of Plaintiffs and the Class)**

61.     Plaintiffs incorporate and reallege the foregoing allegations of fact.

62.     CDK Global collected sensitive information from Plaintiffs and Class members in connection with Plaintiffs' and Class Members' use of CDK Global's software and other services. CDK Global undertook to provide data storage, operations management tools, and other services, on which Plaintiffs and Class members' businesses depended.

63.     CDK Global owed Plaintiffs and Class members a duty of reasonable care to preserve and protect the information being stored, transferred, and secured and to ensure that

Defendant's software tools and other services stayed operational and did not experience extended outages or unavailability.

64.     This duty included, among other obligations, maintaining and testing CDK Global's security systems and computer networks, implementing training and other protocols and procedures to guard against cyberattack, and taking other reasonable security measures to safeguard and adequately secure its systems from unauthorized access and use.

65.     CDK Global's duty further included the obligation to provide data security consistent with industry standards and other requirements discussed herein, and to ensure Defendant's electronic systems and networks were adequately protected at all relevant times.

66.     Defendant had a common law duty to prevent foreseeable harm to others, including its customers. Plaintiffs and Class members were the foreseeable and probable victims of any inadequate security practices on the part of CDK Global. It was foreseeable that Plaintiffs and Class members would be harmed by Defendant's failure to protect against cyberattack. CDK Global knew that hackers routinely target sensitive personal information like that housed on its systems, and CDK Global knew that such an attack would or could freeze or otherwise impair services CDK Global was providing to Plaintiffs and Class members, on which they rely.

67.     CDK Global also owed a duty to Plaintiffs and Class members, by operation of statute, to implement and ensure adequate data security practices. For instance, under the FTC Act, 15 U.S.C. § 45(a), Defendant had a duty to provide fair and adequate computer systems and data security practices, including to safeguard PII.

68.     CDK Global's actions and inaction breached its duties by failing to provide adequate data security to safeguard its systems.

69.     Plaintiffs and Class members were the foreseeable victims of Defendant's inadequate and ineffectual cybersecurity. The natural and probable consequence of Defendant's failure to adequately secure its information networks was a disruption in the services upon which Defendant knew Plaintiffs and Class members rely.

70.     Defendant knew it was an attractive target for cyber thieves, particularly in light of data breaches experienced by other entities around the United States, including auto dealerships. The Data Breaches were reasonably foreseeable given the known high frequency of ransomware attacks and data breaches.

71.     There is a close connection between Defendant's failure to employ reasonable security protections for its systems and the injuries suffered by Plaintiffs and Class members. Defendant's vulnerability to cyberattack resulted in its systems being taken down, and the inability of Plaintiffs and Class members to use these systems to operate their businesses.

72.     The policy of preventing future harm disfavors application of the economic loss rule, particularly given the sensitivity of the private information entrusted to Defendant. A high degree of opprobrium attaches to Defendant's failure to secure their systems. Defendant had an independent duty in tort to protect this information and thereby avoid reasonably foreseeable harm to Plaintiffs and Class members.

73.     As a result of Defendant's negligence, Plaintiffs and Class members have suffered actual damages in an amount to be proven at trial. Plaintiffs and Class members seek an award of nominal damages in the alternative.

<u>**SECOND CAUSE OF ACTION**</u>
**BREACH OF CONTRACT**
**(On Behalf of Plaintiff Manderbach Ford and the Class)**

74.     Plaintiffs incorporate and reallege the foregoing allegations of fact

75. Plaintiff Manderbach Ford brings this claim individually and on behalf of the Class.

76. CDK Global entered into contracts with Plaintiff Manderbach Ford and Class members.

77. Plaintiff Manderbach Ford and Class members paid for CDK Global's services and discharged any and all other duties that Plaintiff owed.

78. In exchange, CDK Global was to provide Plaintiff Manderbach Ford and Class members access to its dealer management system and other services.

79. After the Data Breaches, CDK Global deactivated its dealer management system and other services, depriving Plaintiff Manderbach Ford and Class members' access to and ability to use those services, in breach of CDK Global's contractual obligations.

80. As a direct and proximate result of CDK Global's breaches, Plaintiff Manderbach Ford and Class members sustained actual losses and damages in an amount to be proven at trial. Plaintiff Manderbach Ford and Class members seek an award of nominal damages in the alternative.

**THIRD CAUSE OF ACTION**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs and the Class)**

81. Plaintiffs incorporate and reallege the foregoing allegations of fact.

82. Plaintiffs bring this count in the alternative to their legal claims and lack an adequate remedy at law.

83. Plaintiffs and Class members conferred a benefit on CDK Global by directly or indirectly paying it money for services rendered.

84. CDK Global appreciated and had knowledge of the benefits conferred upon it by Plaintiffs and Class members.

85.     In exchange for receiving Plaintiffs' and Class members' money, which provided CDK Global a commercial benefit, CDK Global was obligated to supply Plaintiffs and Class members with access to and use of its software and systems. Following the Data Breach, however, CDK Global deactivated those services.

86.     Equity and good conscience forbid retention by CDK Global of the financial benefits it obtained from Plaintiffs and Class members under these circumstances.

87.     As a result of CDK Global's wrongful conduct, Plaintiffs and Class members suffered harm as described herein and are entitled to restitution. CDK Global should therefore be compelled to disgorge into a common fund for the benefit of Plaintiffs and Class members all unlawful or inequitable proceeds it received therefrom.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for an order:

A.  Certifying this action as a class action, appointing Plaintiffs as Class representatives, and appointing Plaintiffs' counsel to represent the Class;

B.  Entering judgment for Plaintiffs and the Class;

C.  Awarding Plaintiffs and Class members actual or nominal damages or restitution;

D.  Awarding pre- and post-judgment interest as prescribed by law;

E.  Awarding reasonable attorneys' fees and costs as permitted by law;

F.  Granting such further and other relief as may be just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all issues so triable.

Date: July 12, 2024

Respectfully submitted,

By: */s/ Elizabeth A. Fegan*
Elizabeth A. Fegan (IL #6229226)
**FEGAN SCOTT LLC**
150 S. Wacker Dr., 24th Floor
Chicago, IL 60606
Phone: (312) 741-1019
beth@feganscott.com

Adam E. Polk (*pro hac vice* forthcoming)
Anthony Rogari (*pro hac vice* forthcoming)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
apolk@girardsharp.com
arogari@girardsharp.com

Jonathan Shub (Bar ID No. 53965)
Benjamin F. Johns
Samantha E. Holbrook
**SHUB & JOHNS LLC**
Four Tower Bridge
200 Barr Harbor Drive, Suite 400
Conshohocken, PA 19428
Phone: (610) 477-8380
bjohns@shublawyers.com
jshub@shublawyers.com
sholbrook@shublawyers.com

*Counsel for Plaintiffs and*
*the Proposed Class*